**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| SHANNON HUNTER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )　　　　1:19CV912 |
| | ) |
| ANDREW M. SAUL, | ) |
| Commissioner of Social | ) |
| Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff, Shannon Hunter, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 8 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 12, 14; see also Docket Entry 13 (Plaintiff's Brief), Docket Entry 15 (Defendant's Memorandum); Docket Entry 16 (Plaintiff's Reply). For the reasons that follow, the Court should enter judgment for Defendant.

**I. PROCEDURAL HISTORY**

Plaintiff applied for DIB and SSI, alleging an onset date of August 31, 2015. (Tr. 236-37, 238-44.) Upon denial of those applications initially (Tr. 74-103, 139-49) and on reconsideration

(Tr. 104-35, 155-72), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 173-74). Plaintiff, her non-attorney representative, and a vocational expert ("VE") attended the hearing. (Tr. 37-73.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 13-31.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 230-32, 339-41), making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

1. [Plaintiff] meets the insured status requirements of the [] Act through December 31, 2021.

2. [Plaintiff] has not engaged in substantial gainful activity since August 31, 2015, the alleged onset date.

. . .

3. [Plaintiff] has the following severe impairments: hypertension, diabetes mellitus, migraine without status migrainous, not intractable, insomnia, hyperlipidemia, depressive disorder and anxiety disorder.

. . .

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5. . . . [Plaintiff] has the residual functional capacity to perform light work . . . except that she can frequently balance, stoop, kneel, crouch, or crawl. She needs to avoid concentrated exposure to loud noise, unprotected heights, moving mechanical parts and unprotected direct sunlight. She is limited to simple, routine tasks but not at a production rate pace, e.g.,

2

assembly line work. She is capable of sustaining concentration and pace for two-hour segments during a standard eight-hour workday. She is limited to simple work related instructions and directions, she is limited to occasional interaction with the public, and she is limited to routine changes in an unskilled work setting.

. . .

6. [Plaintiff] is unable to perform any past relevant work.

. . .

10. Considering [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [she] can perform.

. . .

11. [Plaintiff] has not been under a disability, as defined in the [] Act, from August 31, 2015, through the date of this decision.

(Tr. 18-31 (bold font and internal parenthetical citations omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

3

## A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the

4

[Commissioner] (or the ALJ)." <u>Id.</u> at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" <u>id.</u> (quoting 42 U.S.C. § 423(d)(1)(A)).[1] "To regularize the adjudicative process, the Social Security Administration has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." <u>Id.</u> "These regulations establish a

---

[1] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. [SSI] . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." <u>Craig</u>, 76 F.3d at 589 n.1 (internal citations omitted).

Case 1:19-cv-00912-CCE-LPA   Document 17   Filed 11/10/20   Page 5 of 27

'sequential evaluation process' to determine whether a claimant is disabled." <u>Id.</u> (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' *i.e.*, currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." <u>Albright v. Commissioner of the Soc. Sec. Admin.</u>, 174 F.3d 473, 475 n.2 (4th Cir. 1999).[2]  A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied.  The second step determines if the claimant is 'severely' disabled.  If not, benefits are denied." <u>Bennett v. Sullivan</u>, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, the "claimant is disabled." <u>Mastro</u>, 270 F.3d at 177.  Alternatively, if a claimant clears steps one and two, but falters at step three, *i.e.*, "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment,

---

[2] "Through the fourth step, the burden of production and proof is on the claimant.  If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." <u>Hunter</u>, 993 F.2d at 35 (internal citations omitted).

the ALJ must assess the claimant's residual functional capacity ("RFC")." Id. at 179.[3]  Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. Id. at 179-80.  However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[4]

---

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)).  The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265.  "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

[4] A claimant thus can establish disability via two paths through the SEP.  The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five.  Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

## B. Assignments of Error

Plaintiff argues that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he ALJ gave great weight to the opinions of the [state a]gency psychological record reviewers who found that [Plaintiff] would adjust better to a work setting that does not require much interaction, but the ALJ did not include any limitations interacting with coworkers and/or supervisors [in the RFC or dispositive hypothetical question], or explain why he omitted them" (Docket Entry 13 at 8 (bold font and single-spacing omitted); accord Docket Entry 16 at 1); and

2) "[t]he ALJ rejected the opinions of [Plaintiff]'s treating psychiatrist [Dr. Barbara A. Lowry], but [the ALJ's] reasons for doing so are not supported by substantial evidence" (Docket Entry 13 at 14 (bold font and single-spacing omitted); accord Docket Entry 16 at 4).

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (Docket Entry 15 at 10-19.)

### 1. Interaction with Supervisors and Coworkers

In Plaintiff's first issue on review, she faults the ALJ for affording "great weight to the opinions of the [state a]gency psychological record reviewers who found that [Plaintiff] would adjust better to a work setting that does not require much interaction, but . . . not includ[ing] any limitations interacting

8

with <u>coworkers</u> and/or <u>supervisors</u> [in the RFC or dispositive hypothetical question], or explain[ing] why he omitted them." (Docket Entry 13 at 8 (emphasis added) (bold font and single-spacing omitted); <u>accord</u> Docket Entry 16 at 1.)  In particular, Plaintiff points out that "[t]he ALJ only limited [Plaintiff]'s interaction with the <u>public</u> [in the RFC], but [that] the [state a]gency [psychological] record reviewers made no such distinction in their Functional Capacity Assessment or narrative discussion of all mental capacities and limitations."  (Docket Entry 13 at 11 (emphasis added).)  Plaintiff further contends that the ALJ's decision does not clarify why the ALJ "narrowed the record reviewers' social limitation finding" (<u>id.</u>) in violation of <u>Thomas v. Berryhill</u>, 916 F.3d 307 (4th Cir. 2019) (<u>id.</u> at 12-13), and notes that both Plaintiff "and her mother indicated that [Plaintiff] had difficulty interacting with anyone other than her mother, stepfather, and doctors" (<u>id.</u> at 11).  According to Plaintiff, "[t]he ALJ's omission is significant because the ability to respond appropriately to supervisors and coworkers is one of the basic mental demands of competitive, remunerative, unskilled work, and a substantial loss of the ability to meet th[o]se work related activities would severely limit the potential occupational base, which would, in turn, justify a finding of disabled."  (<u>Id.</u> at 13-14.)

Here, the ALJ accorded "significant weight" to the opinions of the state agency psychological consultants (Tr. 27), including

9

their opinion that Plaintiff would "adjust better in a setting that d[id] not require much interaction" (Tr. 28 (emphasis added); see also Tr. 86, 100, 115, 130). In the RFC, the ALJ limited Plaintiff to "occasional interaction with the public" (Tr. 21 (emphasis added)), but did not limit the degree of Plaintiff's interaction with supervisors or coworkers (see id.), and the ALJ's decision does not expressly explain why he omitted those restrictions (see Tr. 18-29). However, for the reasons explained more fully below, the ALJ did not err in that regard.

As an initial matter, the state agency psychological consultants' statement that Plaintiff would "adjust better in a setting that d[id] not require much interaction" (Tr. 86, 100, 115, 130 (emphasis added)), by itself, does not equate to an opinion that, without an interaction limitation, Plaintiff would qualify as disabled or would not remain capable of holding competitive employment. As such, crediting that statement did not obligate the ALJ to include any particular limitation on Plaintiff's ability to interact with others in the RFC. However, because the consultants found more generally at step two of the SEP that Plaintiff had moderate limitation in her ability to function socially (see Tr. 81, 95, 110, 125), the Court should proceed to evaluate whether substantial evidence supports the ALJ's decision to omit limitations on interaction with coworkers and supervisors from the RFC.

Consideration of the state agency psychological consultants' mental RFC findings regarding Plaintiff's ability to function socially permit the Court to meaningfully review the ALJ's decision to omit from the RFC restrictions relating to interaction with coworkers and supervisors. In the mental RFC assessment, the state agency psychological consultants found Plaintiff "[m]oderately limited" in her "ability to interact appropriately with the general public." (Tr. 86, 100, 115, 130 (emphasis added).) In contrast, the consultants rated Plaintiff as "[n]ot significantly limited" in her abilities to "ask simple questions or request assistance," "accept instructions and respond appropriately to criticism from supervisors," "get along with coworkers or peers without distracting them or exhibiting behavioral extremes," and "maintain socially appropriate behavior." (Id. (emphasis added).) Thus, as the Commissioner argues, "the ALJ's RFC assessment that only limited Plaintiff's interaction with the public (and not her interaction with coworkers and supervisors) was entirely consistent with the state agency psychologi[cal consultants' opinions]." (Docket Entry 15 at 15.)

In Reply, Plaintiff faults the Commissioner for relying on "assessments the [state a]gency consultants made in [s]ection I of the mental RFC form" (Docket Entry 16 at 1), and argues that the SSA's Program Operations Manual System ("POMS") makes clear that:

> *[t]he purpose of section I ("Summary Conclusion") is chiefly to have a worksheet to ensure that the*

11

*psychiatrist or psychologist has considered each of these pertinent mental activities and the claimant's degree of limitation for sustaining these activities over a normal workday and workweek on an ongoing, appropriate, and independent basis.  **It is the narrative** written by the psychiatrist or psychologist **in section III** ("Functional Capacity Assessment") of the form **that adjudicators are to use as the assessment of RFC.***

(Id. (italics and bold font supplied by Plaintiff) (citing POMS § DI 25020.010B.1).)  Plaintiff further contends that the Court has previously "found that the state agency psychological consultants' explanations in the narrative portions of the mental RFC forms suffice to explain their *ultimate* conclusions."  (Id. at 2-3 (citing Weinshenker v. Berryhill, No. 1:17CV4, 2017 WL 3841861, at *14 (M.D.N.C. Sept. 1, 2017) (unpublished), recommendation adopted, slip op. (M.D.N.C. Oct. 10, 2017) (Eagles, J.)).)  For the reasons discussed more fully below, that argument falls short.

In Weinshenker, the plaintiff had argued that "there [wa]s no determination [by the ALJ] as to how [the plaintiff] would be able to accept instructions, criticism, etc. from her supervisors . . . despite both [s]tate agency psychological consultants, whose opinions the ALJ gave great weight, opining that [the plaintiff wa]s moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors." Weinshenker, No. 1:17CV4, Docket Entry 9 at 13 (M.D.N.C. May 19, 2017) (internal citation omitted); see also id. at 15-15 (contending that "POMS DI 25020.010(B)(2)(c) states that the mental ability to accept instructions and respond appropriately to criticism from

12

supervisors is needed to do any job and POMS DI 25020.010(B)(3)(k) says the ability to accept instructions and respond appropriately to criticism from supervisors is a critical mental ability for performing unskilled work[, b]ut again the ALJ does not discuss [the plaintiff]'s capability in this required work function despite the fact he gave great weight to the psychological consultants' opinions who said she is moderately limited in this required work ability" (internal citation omitted)).

The Court rejected the plaintiff's argument, reasoning as follows:

> [T]he ALJ properly accounted in the RFC for [the plaintiff]'s moderate limitation in the ability to accept instructions and respond appropriately to criticism from supervisors by limiting [the plaintiff] to only "occasional contact" with such individuals. Moreover, the ALJ gave "great weight" to the opinions of state agency psychological consultants, who concluded, <u>in the narrative portion of the mental RFC form</u>, that, despite "[m]oderate[] limit[ation]" in "[t]he ability to accept instructions and respond appropriately to criticism from supervisors," [the plaintiff] remained capable of performing work "in settings with no demand for extensive social interactions. . . . The state agency psychological consultants' explanations in the <u>narrative</u> portions of the mental RFC forms <u>suffice</u> to explain their <u>ultimate</u> conclusions.

<u>Weinshenker</u>, 2017 WL 3841861, at *14 (first emphasis in original, subsequent emphasis added) (internal citations omitted). Thus, consistent with the SSA's policy (as expressed in, <u>inter alia</u>, Section DI 25020.010B.1 of the POMS), the Court found that the ALJ properly relied on the <u>narrative</u> portion of the state agency psychological consultants' mental RFC assessments in formulating

13

the mental RFC.  Id.; see also Graham v. Saul, No. 1:18CV403, 2019
WL 3767041, at *12 (M.D.N.C. Aug. 9, 2019) (unpublished)
(concluding that ALJ "did not err by relying on [the state agency
consultant's] narrative mental RFC assessment" because the check-
box portion of the form constituted "merely a worksheet to aid in
deciding the presence and degree of functional limitations," and
"state agency consultants assess the actual mental RFC in the
narrative portion of the form" (citing POMS §§ DI 24510.060B.2.a
and 24510.010B.4)), recommendation adopted, 2019 WL 5783543
(M.D.N.C. Sept. 3, 2019) (unpublished) (Eagles, J.).

        As made clear by the Court's above-quoted reasoning,
Plaintiff's argument overstates the holding of Weinshenker.  By
finding that an ALJ need not account in the mental RFC for the
limitations in the worksheet portion of the state agency
consultants' mental RFC assessments, the Court did not thereby deem
those worksheet limitations irrelevant to an analysis of the
consultants' opinions.  Here, the consultants did not define the
phrase "a work setting that does not require much interaction" in
their narrative regarding Plaintiff's social interaction
limitations (Tr. 86, 100, 115, 130 (emphasis added)) and thus the
Court can look to the consultants' individual findings in the
worksheet area above the narrative to help further define the
limitation the consultants intended.  Because the consultants found
Plaintiff "[m]oderately limited" in her "ability to interact
appropriately with the general public," but "[n]ot significantly

14

limited" in her abilities to "ask simple questions or request assistance," "accept instructions and respond appropriately to criticism from <u>supervisors</u>," and "get along with <u>coworkers</u> or peers" (<u>id.</u> (emphasis added)), the ALJ's RFC limitation to only occasional interaction with the <u>public</u> harmonizes with the consultants' opinions.

In sum, Plaintiff's first assignment of error lacks merit.

### 2. Opinions of Dr. Lowry

In Plaintiff's second and final issue on review, she asserts an entitlement to relief because "[t]he ALJ rejected the opinions of [Plaintiff]'s treating psychiatrist [Dr. Lowry], but [the ALJ's] reasons for doing so are not supported by substantial evidence." (Docket Entry 13 at 14 (bold font and single-spacing omitted); <u>accord</u> Docket Entry 16 at 4.) Plaintiff's arguments in this regard miss the mark.

The treating source rule generally requires an ALJ to give controlling weight to the opinion of a treating source regarding the nature and severity of a claimant's impairment. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) ("[T]reating sources . . . provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."). The rule

15

also recognizes, however, that not all treating sources or treating source opinions merit the same deference. The nature and extent of each treatment relationship appreciably tempers the weight an ALJ affords an opinion. *See* 20 C.F.R. §§ 404.1527(c)(2)(ii), 416.927(c)(2)(ii). Moreover, as subsections (2) through (4) of the rule detail, a treating source's opinion, like all medical opinions, deserves deference <u>only</u> if well-supported by medical signs and laboratory findings <u>and</u> consistent with the other substantial evidence of record. *See* 20 C.F.R. §§ 404.1527(c)(2)-(4), 416.927(c)(2). "[I]f a physician's opinion is not supported by clinical evidence <u>or</u> if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." <u>Craig</u>, 76 F.3d at 590 (emphasis added). Finally, statements from medical sources (and even treating sources) that a claimant qualifies as disabled or cannot work do not constitute "medical opinions as described in [§§ 404.1527(a)(1) and 416.927(a)(1)], but are, instead, opinions on issues reserved for the Commissioner" and do not warrant controlling weight. 20 C.F.R. §§ 404.1527(d), 416.927(d).[5]

---

[5] For claims filed on or after March 27, 2017, the Commissioner has significantly amended the regulations governing opinion evidence. The new regulations provide that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c. As Plaintiff filed her claims prior to March 27, 2017 (<u>see</u> Tr. 16, 236-44), this Recommendation has analyzed Plaintiff's claims pursuant to the treating physician rule set out above.

16

Dr. Lowry completed a preprinted form entitled "Physician's Order" on July 17, 2017 (Tr. 601), on which she diagnosed Plaintiff with "severe [post-traumatic stress disorder ('PTSD')] with panic, agoraphobia, and depression." (Tr. 601). Dr. Lowry stated that Plaintiff "[wa]s literally housebound, highly symptomatic, and unable to work at all." (Id.) On April 25, 2018, Dr. Lowry signed a "To Whom It May Concern" letter in which she opined, in pertinent part, as follows:

> [Plaintiff] has been my patient since December 12, 2016. She has been diagnosed with Major Depressive Disorder, severe vs. Bipolar Disorder with severe depression, anxiety, and panic attacks.
>
> [Plaintiff] has been a cooperative and compliant patient who attends all her visits. She takes Effexor XR 300mg every morning, Topamax 200mg twice a day, Zyprexa 20mg at bedtime, Klonopin 1mg, 5 a day, and Ambien 20mg at bedtime. She is in biweekly therapy with one of our therapists.
>
> In spite of ongoing treatment [Plaintiff] remains extremely dysfunctional with continued severe depression and anxiety. She frequently is afraid to leave her house, stays on her couch or in bed all day, won't eat or bathe, can't sleep, isolates from others, and is very paranoid and fearful. She has an unhealthy attachment to her mother and panics if she can't get to her.
>
> [Plaintiff] has no friends, no hobbies or interests, nothing she cares about. She can't concentrate, has terrible memory, and no motivation for life. She can't tolerate the least amount of stress especially being around others. Her prognosis is extremely poor.
>
> In my medical opinion [Plaintiff] will never improve and certainly not enough to be gainfully employed. I believe she is totally and permanently incapacitated for any type of work.

(Tr. 758.)

17

The ALJ evaluated and weighed Dr. Lowry's opinions as follows:

> The [ALJ] has considered the opinion of Dr. Lowry;
> however, the [ALJ] has given little weight regarding the
> conclusion that [Plaintiff] is "totally and permanently
> incapacitated." The medical evidence as a whole,
> including progress notes from Dr. Lowry, have shown that
> [Plaintiff] reported doing well with her medication
> regimen, her cognitive functioning including memory have
> been intact, and her mental status examinations have been
> mostly within normal limits. In addition, the opinion of
> disability is an opinion reserved for the Commissioner.

(Tr. 28.) Plaintiff challenges the ALJ's decision to discount Dr.
Lowry's opinions on two grounds (see Docket Entry 13 at 14-31),
neither of which provide the Court with a basis to disturb the
ALJ's findings regarding Dr. Lowry.

First, Plaintiff faults the ALJ for according more weight to
the opinions of the state agency psychological consultants than to
Dr. Lowry's opinions, because the consultants "did not review any
mental health medical evidence after March 2016, [Plaintiff]'s
testimony, or Dr. Lowry's opinions, so the[ consultants'] opinions
are undercut by the paucity of evidence they reviewed." (Docket
Entry 13 at 27 (citing Tr. 27-28); see also Docket Entry 16 at 7
("[T]he Agency psychological consultants did not review any mental
health medical evidence after March 2016, including Dr. Lowry's
opinions and treatment notes . . . .").) According to Plaintiff,
"[a]n ALJ may credit the opinion of a non-treating, non-examining
source where that opinion has sufficient indicia of 'supportability
in the form of a high-quality explanation for the opinion and a
significant amount of substantiating evidence . . .; consistency

18

between the opinion and the record as a whole; and specialization in the subject matter of the opinion'" (Docket Entry 13 at 27-28 (quoting <u>Brown v. Commissioner</u>, 873 F.3d 251, 268 (4th Cir. 2017))), but argues that the consultants' "opinions are bereft of 'a significant amount of substantiating evidence,' and undeserving of great weight for the time period after March 2016" (<u>id.</u> at 28 (quoting <u>Brown</u>, 873 F.3d at 268); <u>accord</u> Docket Entry 16 at 8).

An ALJ must weigh opinions from non-examining state agency consultants using the same factors the ALJ uses to weigh any other medical opinions. <u>See</u> 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii). As a general matter, opinions from an examining source warrant more weight than those from a non-examining source, <u>see</u> 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1); however, non-examining state agency consultants constitute "highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation[,]" 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i), and, as a result, an ALJ can permissibly credit the opinions of non-examining state agency consultants over those of even a treating physician if the consultants' opinions remain consistent with the record as a whole. <u>See</u> <u>Lapeer v. Astrue</u>, No. 5:08CV256, 2009 WL 2487038, at *7 (E.D.N.C. Aug. 13, 2009) (unpublished).

In this case, the state agency psychological consultants opined that Plaintiff "demonstrate[d] the ability to carry out a variety of tasks with a reasonable number and length of rest

19

periods," "w[ould] adjust better to a work setting that d[id] not require much interaction," and "w[ould] adjust best in a low stress, predictable work routine." (Tr. 86-87, 100-01, 115, 130.) The ALJ accorded "significant weight" to the consultants' opinions (Tr. 27-28), whereas the ALJ assigned only "little weight" to Dr. Lowry's opinions (Tr. 28).

Plaintiff's objection that the ALJ should not have credited the state agency consultants' opinions over those of Dr. Lowry <u>solely</u> because the consultants provided their opinions without the opportunity to review Plaintiff's testimony and Dr. Lowry's records runs counter to logic. (Docket Entry 13 at 27-28); <u>see also</u> Docket Entry 16 at 7-8.) State agency consultants provide RFC assessments at the initial and reconsideration levels of the claims process and thus necessarily offer their opinions prior to completion of the record. Thus, under Plaintiff's reasoning, the consultants' opinions would <u>never</u> warrant significant weight. Moreover, as stated above, the <u>consistency</u> of state agency consultants' opinions <u>with the record as a whole</u>, <u>including those records post-dating such opinions</u>, constitutes the proper focus of the inquiry. <u>See, e.g.,</u> <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235 (4th Cir. 1984) (holding that ALJs may rely on opinions of non-examining physicians when such opinions find consistency with whole of record); <u>Thacker v. Astrue</u>, No. 3:11CV246, 2011 WL 7154218, at *6 (W.D.N.C. Nov. 28, 2011) (unpublished) ("The fact that the state agency physician did not have access to the entire evidentiary record — because the

record was incomplete at the time of the assessment — is inconsequential as . . . there is nothing in the additional medical evidence subsequently submitted by Plaintiff to indicate that she possessed limitations beyond [the state agency consultant's RFC]." (internal citation omitted)), recommendation adopted, 2012 WL 380052 (W.D.N.C. Feb. 6, 2012) (unpublished); Bryant v. Astrue, No. 3:08CV719, 2009 WL 6093969, at *9 & n.11 (E.D. Va. Jul. 15, 2009) (unpublished) (affirming ALJ's decision to give non-examining state agency consultants' assessments great weight as consistent with the entire record, even though such consultants "did not have the opportunity to observe the claimant or the opportunity to consider additional evidence submitted subsequent to their review of the record"), recommendation adopted, 2010 WL 1138314 (E.D. Va. Mar. 18, 2010) (unpublished); Bracey v. Astrue, No. 5:07CV265, 2009 WL 86572, at *3 (E.D.N.C. Jan. 6, 2009) (unpublished) (finding no error in ALJ's reliance on state agency consultants' opinions where "treatment notes and clinical findings . . . submitted after [their] assessments indicate[d] similar complaints and assessments as those [they] reviewed" and noting that ALJ considered that additional evidence, which did "not demonstrate a marked change for the worse in [the] plaintiff's health").

Here, review of the evidence considered by the state agency psychological consultants confirms that such evidence remains consistent with evidence post-dating their opinions, including Plaintiff's testimony and Dr. Lowry's treatment records. The

21

consultants had the benefit of Plaintiff's mental health treatment records from Rowan Psychiatric & Medical Services, PA, records from Plaintiff's primary care physician who also treated some of Plaintiff's mental symptoms, records from two visits to the emergency room for psychiatric symptoms, as well as Function Reports from both Plaintiff and her mother. (See Tr. 77-82, 91-96, 105-10, 120-25; see also Tr. 268-89, 342-442, 524-79, 584-96.) The Function Reports reflect Plaintiff's complaints of insomnia, anxiety, social withdrawal, trouble concentrating, and problems with her memory. (See Tr. 268-89.) The mental health records indicate that Plaintiff reported increasing anxiety and depression beginning in 2014 after her son's motor vehicle accident in which he lost his dominant arm, which ultimately caused Plaintiff to lose her long-time job as a legal assistant and move back in with her parents. (See Tr. 347, 414, 533, 592.) Those records also contain Plaintiff's statement during an October 2015 in-patient psychiatric hospitalization that she had hit "rock bottom" and took extra Klonopin and her mother's Neurontin so she could sleep. (See Tr. 346-47.) With the exception of some positive findings upon Plaintiff's admission to her in-patient psychiatric hospitalization (see Tr. 352) and some notations of depressed, tearful, and/or anxious mood (see Tr. 347, 376, 534-35, 591, 594), the records reflect largely unremarkable mental status examinations with good hygiene, cooperative and pleasant demeanor, normal speech and thoughts, intact insight and judgment, as well as normal attention,

22

concentration, and memory (see Tr. 347, 376, 529, 534-35, 585, 587, 589, 591, 594).

The state agency psychological consultants did not have the opportunity to review Plaintiff's hearing testimony, but that testimony did not contain complaints of symptoms that differed materially from those contained in the Function Reports and treatment records the consultants did review. (See Tr. 54-55 & 58-60 (documenting Plaintiff's statements that she lacked motivation and that her anxiety often kept her from doing things outside her home), 61 (reflecting Plaintiff's testimony reporting "nervous breakdown" following loss of her legal assistant job and her son's motor vehicle accident), 64 (recording Plaintiff's assertion that she felt "defeated" and sad), 67 (describing Plaintiff's belief that she could not perform simple, seated job due to decreased concentration and motivation).) Similarly, mental health treatment records from Dr. Lowry's practice (all of which post-dated the state agency consultants' opinions) continued to show similar mental status examinations, with notations of depressed and/or anxious mood and some psychomotor agitation and retardation, but a casual appearance, an open, calm, and receptive demeanor, normal speech and thoughts, intact cognition and memory, and a full-range affect (see Tr. 665-68, 759-64).[9]  Because the mental health

---

[9] The consultants also did not have an opportunity to consider two of Plaintiff's emergency room visits in late 2017. (See Tr. 669-81.)  On each occasion, Plaintiff complained of an increase in anxiety symptoms after running out of her
(continued...)

records post-dating the consultants' opinions remain consistent with the records the consultants reviewed, the ALJ did not err by crediting the consultants' opinions over those of Dr. Lowry.[10]

Second, Plaintiff disputes the ALJ's rationale that "[t]he medical evidence as a whole, including progress notes from Dr. Lowry, have shown that [Plaintiff] reported doing well with her medication regimen, her cognitive functioning including memory have been intact, and her mental status examinations have been mostly within normal limits" (Tr. 28). (See Docket Entry 13 at 15; see also Docket Entry 16 at 5-8 (addressing same issue).) According to Plaintiff, treatment notes from Dr. Lowry and Salisbury Psychological Associates, as well as from other sources, support Dr. Lowry's opinions. (See Docket Entry 13 at 16-24 (citing Tr. 77, 81, 86-87, 91, 95, 100-01, 106, 110, 115, 121, 124-25, 130, 342-56, 525-27, 533-38, 540, 550, 584-92, 594, 595, 661, 665-72, 675, 678, 681, 690-91, 740, 742, 758-64).)

---

[9] (...continued)
anxiety medication (and in the setting of her father's recent death) (see Tr. 669, 675) and, apart from an anxious and/or tearful mood, her mental status examination remained normal and neither physician would prescribe further anxiety medication (see Tr. 671-72, 678, 681).

[10] Plaintiff maintains that the state agency psychological consultants did not "indicate that [Plaintiff] 'showed stability and good functional ability,' as the ALJ asserted." (Docket Entry 13 at 27 (quoting Tr. 27-28); see also Docket Entry 16 at 7.) In fact, the consultants did opine, in the Psychiatric Review Technique portion of their assessments, that Plaintiff "showed current stability and good functional ability," "[wa]s able to learn and carry out a variety of tasks in a low stress routine," and w[ould] adjust better in a setting that does not require much interaction." (Tr. 82, 96, 110 (reconsideration-level consultant affirming same) (emphasis added), 125 (reconsideration-level consultant affirming same) (emphasis added).)

24

Plaintiff misinterprets this Court's standard of review. The Court must determine whether the ALJ supported his analysis of Dr. Lowry's opinion with substantial evidence, defined as "more than a mere scintilla of evidence but may be somewhat less than a preponderance," Mastro, 270 F.3d at 176 (brackets and internal quotation marks omitted), and not whether other record evidence weighs against the ALJ's analysis, Lanier v. Colvin, No. CV414-004, 2015 WL 3622619, at *1 (S.D. Ga. June 9, 2015) (unpublished) ("The fact that [the p]laintiff disagrees with the ALJ's decision, or that there is other evidence in the record that weighs against the ALJ's decision, does not mean that the decision is unsupported by substantial evidence."). The ALJ here buttressed his decision to discount Dr. Lowry's opinions by noting, inter alia, that "[t]he medical evidence as a whole, including progress notes from Dr. Lowry, have shown that . . . [Plaintiff's] mental status examinations have been mostly within normal limits" (Tr. 28) and, as discussed above, substantial evidence supports that rationale (see Tr. 347, 376, 529, 534-35, 585, 587, 589, 591, 594, 665-68, 759-64).[11]

---

[11] The ALJ's summation paragraph contained within his RFC assessment provides further reasons for discounting Dr. Lowry's opinions that Plaintiff's mental symptoms disabled her:

> [Plaintiff]'s reported activities of daily living, and her work activity is inconsistent with an inability to work. Her alleged onset date was predicated on her losing her job at Paws Plus, which was due to the business closing and no way related to [Plaintiff]'s allegations of disability. She applied for and received unemployment benefits after losing her job, which indicates claimant
> (continued...)

25

In Reply, Plaintiff maintains that, although the ALJ "rejected Dr. Lowry's statement that [Plaintiff] was 'totally and permanently disabled'" (Docket Entry 16 at 5 (quoting Tr. 758, and citing Tr. 28), "he failed to evaluate . . . Dr. Lowry's opinion[s ] that [Plaintiff] remained extremely dysfunctional being frequently afraid to leave her home, stays on the couch or in bed all day, doesn't eat or bathe, can't sleep, isolates from others, [] is very paranoid and fearful[, ] has no motivation for life[,] and can't tolerate the least amount of stress, especially being around others" (id. (citing Tr. 28)).  As an initial matter, in the ALJ's evaluation of Dr. Lowry's opinions, the ALJ did discuss all of the above-listed statements by Dr. Lowry, making abundantly clear that the ALJ considered them.  (See Tr. 28.)  Although the ALJ did not expressly assign "little weight" to those statements, the ALJ's subsequent rationale that "[t]he medical evidence as a whole, including progress notes from Dr. Lowry, have shown that [Plaintiff] reported doing well with her medication regimen, her cognitive functioning including memory have been intact, and her mental status examinations have been mostly within normal limits"

---

[11] (...continued)
    was physically willing and able to work during this time.  Further,
    she was able to obtain work after her alleged onset date and her
    work activity as a waitress was at substantial gainful activity
    levels.

(Tr. 29.)

(Tr. 28) should leave the Court with no doubt that the ALJ rejected them.[12]

In short, as the ALJ did not err in his evaluation of Dr. Lowry's opinions, Plaintiff's second assignment of error lacks merit.

### III.  CONCLUSION

Plaintiff has not established an error warranting relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for a Judgment Reversing or Modifying the Decision of the Commissioner of Social Security or Remanding the Cause for a Rehearing (Docket Entry 12) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 14) be granted, and that judgment be entered for Defendant.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

November 10, 2020

---

[12] Indeed, as the ALJ indicated (see Tr. 28), the record evidence contradicts many of Dr. Lowry's extreme statements (compare Tr. 55, 60 (Plaintiff's testimony that she drove to grocery store and pharmacy), 269, 272 (Plaintiff's statements on Function Report that she watches TV, works puzzles, reads, and cares for her dog), 585, 587, 589, 591 (describing Plaintiff's grooming as "good"), 594 (noting Plaintiff's "clean" grooming and "appropriate" appearance), 643 (Plaintiff's statement to primary care physician that a "friend" had checked her blood sugar and that she was "eating well"), 665 (Plaintiff's assertion to counselor at Dr. Lowry's practice that Plaintiff avoided going to large and busy public places like WalMart, the movies, the fair, and some restaurants), and 665-68, 759-64 (Dr. Lowry's treatment records containing no references to lack of hygiene or grooming), with Tr. 601 (Dr. Lowry's statement that Plaintiff remained "literally housebound"), and 758 (Dr. Lowry's statements that Plaintiff had "no hobbies or interests, nothing she cared about," had "no friends," "won't eat," and "won't . . . bathe").

Case 1:19-cv-00912-CCE-LPA   Document 17   Filed 11/10/20   Page 27 of 27